SK/ADW
F. #2014R00150/OCDETF# NY-NYE-653

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                                14-CR-465 (S-2) (RJD)

    - against -

MARTIN LEONEL PEREZ CASTRO,
    also known as "Richard,"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S DETENTION MEMORANDUM

                                            BREON PEACE
                                            UNITED STATES ATTORNEY
                                            Eastern District of New York
                                            271 Cadman Plaza East
                                            Brooklyn, New York 11201

Saritha Komatireddy
Andrew D. Wang
Assistant United States Attorneys
(Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum in support of its application for a permanent order of detention for the defendant Martin Leonel Perez Castro, also known as "Richard," the leader of the 30th Front of the Fuerzas Armadas Revolucionarias de Colombia (the Revolutionary Armed Forces of Colombia or "FARC"), a violent left-wing guerilla organization that funded its operations through narcotrafficking. Perez Castro was arrested by Colombian authorities on July 20, 2014. He was extradited from Colombia to the United States earlier this morning and is scheduled to appear before the Court this afternoon for an arraignment on the Second Superseding Indictment in this case. See ECF No. 3 (the "Indictment"). For the reasons set forth below, at his arraignment, the Court should enter a permanent order of detention, as no condition or combination of conditions can assure the safety of the community or Perez Castro's appearance at trial.

STATEMENT OF FACTS

I.    The FARC[1]

Between 2009 and through his arrest by Colombian authorities on July 20, 2014, Perez Castro was a senior member of the FARC.

The FARC was founded in or about 1964 as a left-wing guerilla group dedicated to the violent overthrow of the Government of Colombia. In the ensuing decades, the FARC engaged in armed confrontations and attacks against Colombian government forces, using a variety of firearms and explosives. The FARC also sought to achieve its political ends through targeted assassinations, kidnapping, and other terrorist tactics.

To finance its armed campaign against the Colombian government, the FARC entered the cocaine trade, eventually becoming the world's largest supplier of cocaine and cocaine paste. The FARC controlled large areas of land in Colombia, primarily in regions that grew coca and processed cocaine. The FARC was a highly structured criminal organization, comprised of groups known as "Fronts" or "Mobile Columns" (collectively, "Fronts"). Each Front was primarily responsible for all activities in the geographic area that it controlled, including all activities relating to cocaine and cocaine paste manufacturing and distribution.

The FARC generated substantial amounts of revenue from the cocaine trade in various ways. For example, the FARC imposed a "tax" on individuals involved in every aspect of cocaine and cocaine paste production that occurred within territory under its control, including

---

[1] As permitted by the Second Circuit, the government proceeds by factual proffer in support of its motion for a permanent order of detention. See United States v. LaFontaine, 210 F.3d 125, 130–31 (2d Cir. 2000); United States v. Ferranti, 66 F. 3d 540, 542 (2d Cir. 1995). As this proffer seeks only to articulate facts sufficient to justify detention, it is not a complete statement of all the evidence of which the government is aware or which it will seek to introduce at trial.

3

coca farmers, cocaine lab operators, and cocaine traffickers who received and moved finished cocaine. In return for these "taxes," the FARC protected drug traffickers from theft, assisted the movement of cocaine paste within areas under its control, and escorted loads of cocaine as they were transported out of FARC-controlled areas to shipment points en route to the United States, Europe, and other countries.

In addition to collecting "taxes," the FARC was also directly involved in the production and distribution of cocaine. The FARC bought and sold cocaine paste, sometimes mandating that all cocaine paste in a region be sold to the FARC. In turn, the FARC would either resell the cocaine paste to cocaine transportation organizations at prices set by the FARC or convert it to cocaine directly in FARC laboratories. As a direct producer and seller of cocaine the FARC established direct ties with cocaine trafficking organizations so that the cocaine could be transported to the United States and elsewhere. The FARC's role in the drug trade also sometimes resulted in campaigns against rival drug trafficking organizations and government forces to protect or expand the FARC's control over coca-rich regions.

II.     Perez Castro's Membership and Leadership in the FARC

Perez Castro served as a senior member of the FARC from at least as early as July 2009. Beginning in October 2011, Perez Castro assumed command of the FARC's 30th Front.

As commander of the 30th Front, Perez Castro was responsible for directing both the 30th Front's military operations and cocaine manufacture and distribution operations. In that capacity, he distributed and exported thousands of kilograms of cocaine and earned millions of dollars for the FARC in the process.

This criminal activity is evidenced by multiple cocaine seizures, drug ledgers, lawfully-intercepted communications, recordings of meetings among FARC members and co-

4

conspirators, and witness testimony. For example, in January 2013, off the coast of Colombia, law enforcement officials intercepted and seized a self-propelled semi-submersible vessel, which Perez Castro and his co-conspirators had commissioned and used to transport approximately 3,000 kilograms of cocaine. In March 2013, law enforcement authorities discovered and destroyed a cocaine production laboratory in Timbiqui, Colombia, which Perez Castro co-owned, and seizing approximately 1,752 kilograms of cocaine, 1,500 kilograms of cocaine paste, and large stores of precursor chemicals and cut coca leaves during the operation. In April 2013, again off the coast of Colombia, law enforcement authorities intercepted and seized another vessel, commissioned by Perez Castro and his co-conspirators, and used by them to transport approximately 1,186 kilograms of cocaine.

III.   Foreign Authorities' Arrest and Extradition of Perez Castro

On July 20, 2014, Colombian law enforcement authorities arrested Perez Castro at a luxury home located in Cauca, Colombia, a region that was under the control of the FARC's 30th Front. At the time of his arrest, Perez Castro was being protected by several FARC soldiers and was in possession of the equivalent of more than $800,000 in Colombian pesos.

On June 8, 2017, a grand jury sitting in the Eastern District of New York returned the Indictment, which spans five years of Perez Castro's criminal conduct. Count One charges Perez Castro with leading a Continuing Criminal Enterprise ("CCE"), in violation of Title 21, United States Code, Sections 848(a), 848(b), and 848(c), predicated on four violations, for his role as a senior member of the FARC and commander of its 30th Front. Counts Two, Three, Four, and Five charge Perez Castro with conspiring and participating in the international manufacture and distribution of cocaine, knowing and intending that the narcotics would be illegally imported into the United States, in violation of Title 21, United States Code, Sections

5

959(a), 959(d), 960(a)(3), 960(b)(1)(B)(ii) and 963. Count Six charges Perez Castro with use of firearms—including a machinegun—in furtherance of his drug trafficking crimes, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 924(c)(1)(B)(ii).[2] Each of the counts in the Indictment carries a statutory maximum of life imprisonment. Count One as charged carries a mandatory minimum of life imprisonment; each of Counts Two through Five carries a mandatory minimum of 10 years' imprisonment.[3]

Following extradition proceedings based on the Indictment, Perez Castro was extradited from Colombia and arrived in the Eastern District of New York earlier today. He will be presented before the Honorable Vera M. Scanlon for arraignment this afternoon.

---

[2] The government of Colombia granted extradition on Counts One through Five. The government of Colombia did not grant extradition on Count Six; as such, at this time, the government does not expect to proceed on that count.

[3] In accordance with assurances that the government previously made to the government of Colombia in connection with extradition, in the event of conviction on any of the counts, the government will not seek a life sentence.

ARGUMENT

I.    Legal Standards

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., a federal court must order a defendant detained pending trial where it determines that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A presumption of dangerousness and risk of flight arises when a defendant is charged with an offense under the Controlled Substances Act or the Controlled Substances Import and Export Act that carries a maximum term of imprisonment of 10 years or more and the Court finds probable cause to believe that the defendant committed such offense. 18 U.S.C. § 3142(e)(3)(A). Probable cause may be established by the sheer fact that a grand jury has returned an indictment charging the defendant with the offense in question. See United States v. Contreras, 776 F.2d 51, 54–55 (2d Cir. 1985).

The presumption means that the Court must initially assume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3124(e)(3). The defendant may rebut this presumption by coming "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (per curiam). If this burden of production is satisfied, the government retains the burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of the evidence that the defendant presents a risk of flight. See 18 U.S.C. § 3142(f); Mercedes, 254 F.3d at 436; United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

7

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history). Indeed—and significantly—danger to the community includes "the harm to society caused by [the likelihood of continued] narcotics trafficking." United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985). In considering risk of flight, courts have found that where the evidence of guilt is strong, it provides "a considerable incentive to flee," United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993), as does the possibility of a severe sentence, see Jackson, 823 F.2d at 7; United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses with significant maximum terms had potent incentives to flee); see also United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was flight risk because her knowledge of seriousness of charges against her gave her strong incentive to abscond to Mexico).

Courts consider several factors in making the determination of whether pretrial detention is appropriate: (1) the nature and circumstances of the crime charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, and past conduct; and (4) the nature and seriousness of the danger to any person or the community that would be posed by release. See 18 U.S.C. § 3142(g). Even where the defendant has met his burden of production to rebut the statutory presumption in favor of detention, the presumption also remains a factor for the Court to consider. Mercedes, 254 F.3d at 436.

II.     A Presumption of Detention Applies

This case involves offenses for which there is a presumption that no condition or combination of conditions will reasonably assure Perez Castro's appearance or the safety of the community.  See 18 U.S.C. § 3142(e)(3).  Specifically, because Perez Castro is charged with multiple counts under the Controlled Substances Act and the Controlled Substances Important and Export Act for which the maximum term of imprisonment is life, he is presumed to pose a danger to the community and a risk of flight.  Accordingly, Perez Castro bears the initial burden of showing that he is not a danger to the community or a flight risk.  For the reasons set forth below, Perez Castro cannot sustain that burden.

III.    Perez Castro Is a Danger to the Community

The facts and circumstances of this case compel Perez Castro's detention, as all four factors set forth in the Bail Reform Act show that he poses a danger to the community.

The conduct with which Perez Castro is charged—leading a continuing criminal enterprise engaged in drug trafficking and participating in an international cocaine manufacturing and distribution conspiracy—are serious and carry life and 10-year mandatory minimum prison sentences.  See 21 U.S.C. §§ 848(a), 848(b), 960(b)(1)(B)(ii).  In addition, Perez Castro's role as commander of the FARC's 30th Front—a unit of soldiers in a violent guerrilla group—involved directing FARC soldiers to engage in violence, attack enemies, and overthrow the Colombian government, and shows that Perez Castro himself took up arms against the Colombian government and was dedicated to violent revolution.  Perez Castro was also involved in extorting drug traffickers in FARC-controlled territory by forcing them to pay "taxes" in return for protection and permission to operate their respective drug operations, and operating cocaine laboratories directly, producing thousands of kilograms of cocaine that was

9

later transported for eventual importation into the United States and elsewhere. The nature of this criminal conduct and of Perez Castro's history and characteristics demonstrates that Perez Castro is a direct threat and danger to the people in Colombia over whom he exercised power by force and a further threat and danger to the people of the United States who suffer from the flow of illicit drugs into their communities.

Moreover, the evidence of Perez Castro's guilt is strong. Law enforcement authorities have seized thousands of kilograms of cocaine in or near Colombia that were either produced in laboratories controlled by Perez Castro or found in vessels operated at his behest. Those seizures are corroborated by testimony from witnesses with first-hand knowledge of Perez Castro's criminal enterprise, documents, and recorded communications between Perez Castro's co-conspirators.

IV.     Perez Castro Poses a Significant Risk of Flight

Similarly, Perez Castro cannot overcome the presumption that he is a risk of flight, for several reasons.

First, if convicted of operating a continuing criminal enterprise as charged in Count One, Perez Castro faces a mandatory minimum sentence of life imprisonment; and if convicted of any of the remaining counts charged in Counts Two through Five, he faces a mandatory minimum sentence of 10 years' imprisonment. All the counts carry a statutory maximum of life imprisonment. Given the significant jail time Perez Castro faces upon conviction, he has a strong incentive to flee the jurisdiction. See Jackson, 823 F.2d at 7 (prospect of severe sentence creates incentive to flee); Martir, 782 F.2d at 1147 (charges with significant maximum terms created potent incentive to flee); Cisneros, 328 F.3d at 618 (seriousness of charges gave defendant strong incentive to abscond).

10

Second, Perez Castro's personal history and characteristics demonstrate that he is a significant flight risk. As previously mentioned, Perez Castro sought to overthrow the government of Colombia and commanded a unit of a violent guerrilla group with that objective. This conduct makes clear that he has no respect for public authority or the rule of law. Thus, there is no reason to believe that Perez Castro would obey the Court's orders or conditions of release if the Court granted bail.

Third, Perez Castro has no known personal ties to the United States and has been brought to the United States for the sole purpose of facing criminal prosecution. He has no legal status in this country. Given his absence of any connection to the United States (aside from his drug trafficking activities) and his extensive ties to Colombia, Perez Castro constitutes a significant risk of flight.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court order the defendant to be detained permanently pending trial, as there is no condition or combination of conditions that could reasonably assure the safety of the community or the defendant's appearance at trial.

Dated: Brooklyn, New York
       June 10, 2022

                                  Respectfully submitted,

                                  BREON PEACE
                                  UNITED STATES ATTORNEY
                                  Eastern District of New York
                                  271 Cadman Plaza East
                                  Brooklyn, New York 11201

      By:      /s/
                                  Saritha Komatireddy
                                  Andrew D. Wang
                                  Assistant U.S. Attorneys
                                  (718) 254-7000